May it please the Court, my name is Niles Illick and I, along with my colleague James Roberts, represent the appellant Muccio Ramirez. This case presents, I think, what we would consider two familiar issues. The first question is whether or not the use of force was reasonable, and second, of course, is whether or not the law was clearly established. The briefs and the record in this case, I think, will establish fairly clearly that there are two versions of events that led to the use of force. We argue that Officer Martin violently threw appellant to the ground. Appellee will argue that Officer Martin tried to gently place appellant on the ground, but that due to his intoxication and the slope of the ground, the appellant merely fell. We contend that these different versions create a fact issue, and that summary judgment was improper. I mean, I hear what you're saying, and that's obviously a very important issue on a qualified immunity appeal, whether we have a fact issue. I get that. That's a very common issue, and I'm not surprised it comes up. The possible complicating factor here is we have multiple videos of the incident with both body cams and cruiser cams. I've watched them all. So, and I understand the parties want to sort of characterize the incident one way and characterize the incident the other way, and that's fine, I'd do the same thing. But we have videos, so why can't we just look at the videos? Sure, and I think that's a Scott B. Harris question. Yeah. And of course, absolutely the court can look to the videos, and absolutely it should look to the videos. But I think what happens with Scott B. Harris arguments is that too often we forget what Justice Scalia wrote in Scott B. Harris, and what he wrote was that when you view that video, it is in Scott B. Harris, it is so absolutely clear that no reasonable juror at all could disagree with what's on there. Now we do, as you have said, Justice Duncan, have multiple views. Just the judge. Just the judge. Just judge. Judge Duncan, we have multiple views. We have different evidence, and we have some, in this case, conflicting evidence. And when we look at all of that in the context of summary judgment, as I think you have alluded to, it's really important to put it in the proper context and use the proper lens, which is, of course, a lens that's deferential to the non-movement. So I don't think we can say that we have one video here that shows absolutely everything. We have a conglomeration of videos that form a mosaic that I think give us a fairly good representation of what happened. Yeah, I mean, so I don't see this. I'll tell you right now. I don't see this. I've had cases where there's a video, but the video is unclear. The video leaves out. There's gaps in the video. The video doesn't actually show what happens. In this one, I see what happens from multiple angles. Now, interpreting that is a different matter, but I see what happens from multiple angles. Is there anything, are you saying there's something in the videos that we can't see? I don't know. There's nothing in the videos you can't see, and I think, frankly, in many respects, I would like this to be a Scott v. Harris case, because when we look at the videos and we listen to what is said, not just look at them, but listen to what is said, we see a person who, of course, doesn't stop when he should, but then eventually stops. He is not perfectly compliant. We're never going to argue that he was perfectly compliant, but as Officer Swaby said, this is a person who's struggling to understand the instructions he's given, not because the instructions aren't clear, but because he doesn't understand English. And you'll hear, I think, on Officer Hanks's video that after the arrest, they say we need to get a Spanish speaker here. So he gets out of the car when he should have put his hands out of the car. He backs up, but then he turns around. He doesn't do it exactly right, but at the moment force is used, and this is where I think maybe it is a Scott v. Harris case. At the moment that force is used, he has followed, Mr. Ramirez has followed the last instruction he was given, and the last instruction he was given was to get on your knees. He is on his knees, facing away from the police with his hands away from him, palms out, fingers spread, facing away from the police, in submission, waiting for arrest. And we know from cases like Little and Amador that a justification for a use of force that may have been earlier goes away when that condition changes. So had the police used, had Officer Martin used his force in an earlier situation, we would be having a different argument here. But at the point that the force was used, we have compliance with police instructions. We have a man on his knees. He'd been told to crawl backwards. He'd been told to walk backwards, but the last instruction he had was to be on his knees. Seven to eight seconds elapses between that instruction and the use of force. If he's not supposed, you know, if he's not on his knees, what else is he supposed to be doing? At that point, he is compliant. So in that respect, Judge Duncan, I feel like maybe it is, I hadn't really thought about it this way, but I think maybe it could be a Scott v. Harris case, and you see him on his knees. Now, I think the reason we're here, or the reason I believe we're here, is because when the district court looked at this case, the district court failed to apply, and I know you hear this all the time, failed to apply the proper summary judgment standard. And I do think it is important to look at the fact that there really are two versions of events that go on here. We contend that our client was compliant, that Mr. Ramirez was ultimately compliant. They contend he was non-compliant. The truth is somewhere in the middle. He was more or less compliant, but not perfectly compliant. The district court found that he wasn't compliant. There's an issue about how he fell. Did he fall because of the force that Officer Martin applied, or did he fall because he was intoxicated and he just kind of stumbled over at the very moment that Officer Martin applied force? Now, I think it's important that we should look to the sanction that the police department put on Officer Martin in this case for this particular use of force, and I think it bears reading here, if I may, if I can find it here, that Officer Martin, using an arm-leveraging tactic against Mr. Ramirez while he was on his knees and not resisting, caused him to impact the pavement with his head. That's at ROA, I think, 281. Did the district court reference the police department sanction in its order? I don't remember. No, Judge Duncan, it didn't. There was an objection to it. It was neither ruled on, the objection was not ruled on, and it wasn't addressed in the opinion. But I think what that sanction does is it goes to this fact question. It's summary judgment evidence of how Mr. Ramirez ended up putting his head on the concrete. Do you recall what the nature of the objection to the evidence was? I don't. I mean, I can ask the other side. I don't remember, but it didn't secure a ruling on that, and the judge didn't rule on it, and it's also in the petitions which were attached to the movements summary judgment evidence. So I think this court can plainly consider it, and I think it should, as evidence not of whether or not the force was excessive, but in terms of how Mr. Martinez or Mr. Ramirez ultimately ended up on the ground. But I think there are further factors that we need to consider, and I think that they're all on the video, but they're subtle and they're hard to sometimes see. Officer Hanks is going to tell you on the video that he has verbal control, so he's going to issue the verbal orders here. At the time that Mr. Ramirez is on the ground, on his knees, facing away, and force is being used, there are no further orders being issued. It is silent. They say, let's go hands on. Officer Hanks remains silent. They come up. They use the force. What does that mean? And I'll ask the other side this, too. I did hear that, let's go hands on. What does that signify? I think in police context, what that means is let's put our hands on him, get him handcuffed, and put him in custody. We hear that a lot, and it basically just means we're going to put the handcuffs on him. But I think we can also look to the fact that Officer Swaby holstered her firearm before this. We see the other police officers going to the car. We see the tension going down at the moment. I say on the video, she's approaching his left side. She's approaching his left side and putting her handgun away. She's holstering the gun at that point. Putting her handgun away, and at the same time, other officers are moving to clear the car. And what all of this shows, especially in the summary judgment context, where all inferences must be made in favor of the non-movement, is that there is a decline in tension. There's a recognition that there's sufficient compliance. This is sufficiently safe for us to go hands on. We can go look in the car. We can put our gun away. We can approach. We're in a safer position now. And that means that the level of force that should have been used should have gone down. And the other six officers did diminish their level of force. They're putting their guns away. They're doing other things. It's just for some reason Officer Martin uses this particularly violent takedown. I don't want to tell you how to use your time, but clearly established law is obviously an important part of the qualified immunity analysis. So why don't you tell us, typically, as you know, an advocate will say, look, this case clearly established the laws of this time. So what's your argument on that? Thank you, Judge Duncan. It's easy to let the time go. I think that the best case we have, we've cited seven cases, of course. And I think that's common. But our very best case is Darden, of course. And Darden is a very familiar case to this court. Of course, it's probably tired of hearing about it. But it is an important case. And it's an important case because it's a serious offense. They're going into a drug house in Darden. We have a DWI here. So a DWI in evading. But there can be no question that going into a drug house as they did in Darden is a serious and dangerous act. It's an act I wouldn't ever want to have to do. But we also see a higher level of resistance and a higher level of noncompliance in Darden than we see here. Here, I think when you look at the video, it just becomes clear that at the moment force is used, there can really be no dispute that Mr. Ramirez was in compliance with police instruction. There can be no argument that he was evading. There can be no argument that he was resisting. And so we find that Darden is the most apt case. Now, Darden, of course, relied on Bush, Newman, and Cooper. And so I find it incumbent when I use Darden to also rely on the cases that Darden used. And so we have relied also on Bush, Newman, and Cooper. Cooper was a DWI case where the guy didn't flee in person, I mean didn't flee in a car, but he fled on foot. And so I think that's an apt case. But you agree, I think you agree, maybe, that in considering the reasonableness of the officer's conduct, we ought to factor into this that Mr. Ramirez was fleeing. I mean, he drove for quite some time after the officers told him to stop. Two miles and six minutes. Okay. Stopped at stoplights in between. Two miles and he stopped, okay. So the sort of the situation was becoming more and more heightened, I guess, as he doesn't stop, right? But he, yeah, that's true. That's absolutely true. But he does stop, right? He does ultimately stop. It's not like they have to put a spike strip out or they have to do a fancy maneuver to spin his car out. He ultimately does stop. He stops in a place where there aren't a lot of lights, but there are all these police car lights on him. They can see him fairly well, as you recognize, as you will recognize in the video. He ultimately submits, and I think this goes back to the Little and Amandor arguments, that when there may have been a justification for the use of force at one point, when that justification disappears or changes, the use of force must also change. What is proportional and appropriate at the time force is used must also change. And that's what we have here. Of course he's fleeing. Of course it's a tense situation. Of course it's at night. Of course he's intoxicated. But at the moment force is used, he's compliant. He is yielding to the police. He's in complete submission, and that really should have changed the analysis. What's the significance of the fact that they were concerned about whether there was anyone else in the car? I mean, that's a challenge to them too. Sure, Judge King. I don't know that it goes at all to the reasonableness of the use of force. So they have seven officers, I think, on the scene. Two of them are devoted to the car eventually. The others to Mr. Ramirez. And I don't think that, you know, you see, I just don't think it has any relevance ultimately to the decision of how they use force. He's submitted. He's put his hands out. He's on his knees, and I don't think that ultimately factors into the decision of whether or not the use of force was reasonable in this case. Again, we rely on Darden. We rely on Cooper. We rely on Bush. We rely on Newman. The cases this court is familiar with, we think this is a case where the district court misapplied the summary judgment standard. They reviewed the evidence in the light most favorable to the appellee, and I think when the court applies the correct standard and looks at our cases, the court will reverse the district court's opinion and remand this to trial. Thank you, counsel. And you have time for rebuttal. Mr. Banowski. Good morning. Good morning. I please the court, your honors. I think that the question that started the discussion is the apropos question here, and that is with all of the video that's available to us, where is the disputed issue of fact? The district court decided this case on a summary judgment motion, and counsel for the plaintiff argues that there's two different versions of facts, but there's not two different versions of facts. There's clearly two different characterizations of what happened, but there's a single set of facts. All of the video together is consistent and shows the entirety of the exchange between the plaintiff and the police officers. There's supplemental evidence by the police officers and by an expert witness, all of which is entirely consistent with the video record. What's missing is any testimony from the plaintiff. The plaintiff could have but did not put in testimony to try and contradict or explain anything to characterize how much force was used on his arm, anything like that. There was none of that. So what we're left with is a singular set of undisputed facts. And so the question is, what do those facts show? And it's important that we view the case from the perspective of the defendant in this case, and that's Officer Martin. And Officer Martin is not responsible for everything that happened at the scene that evening. He's only responsible for whatever his role was. And so from Officer Martin's perspective, what we know is that he arrived at the scene after the plaintiff had pulled over, but before he got out of his car. And all he knows is because he's been dispatched by the dispatcher, all he knows is he's going to assist in a felony stop and that there's been a pursuit. So there's some description about the nature of the pursuit and that he was stopping at traffic lights and so forth. And that's all true. But that's all unknown to Officer Martin because Officer Martin didn't participate in the pursuit. He showed up at the moment that the plaintiff pulled over. And so he just knows that he's participating in a felony stop. And then when he shows up on the scene, he perceives, as we can all see, that the plaintiff is not compliant. What does the record reflect that Officer Martin knew when he arrived at the scene? I hear what you're saying. He didn't participate in the pursuit. What did he know when he got to the scene? He knew that there was a felony pursuit and that he was dispatched to assist in a felony stop. And so there's questions about was there a taillight out or something that was also swerving. But he doesn't know any of that because he doesn't get pulled in until there's already a pursuit underway. When does it turn into a felony pursuit? What does that mean? Well, so in this case, the officers, it was Hanks and Swavey, observed him swerving and observed some, I guess, question about the taillights. So they turn on their lights. And he doesn't stop, right? So then they've got their lights and siren. And he's not stopping it. At this point, because he's not pulling over, it becomes a felony pursuit. And so they radio into dispatch, we're involved in a felony pursuit, and that they're going to attempt a felony stop, which is a much heightened set of procedures, as opposed to just pulling somebody over for driving 10 miles an hour over the speed limit or something along those lines. So when Officer Martin arrives on the scene, he witnesses, just like we all witnessed from viewing the video, that Mr. Ramirez is not compliant. He's kind of compliant, but he's not entirely compliant. And his noncompliance is important because his noncompliance is he turns around and looks at the officers. And the testimony is, the supplemental testimony is that these officers are trained to watch for defendants trying to identify targets. So that raises their sense of heightened awareness, the fact that targets. And so when he's instructed to turn around and not face the officers, but he turns around and faces them, then that creates problems for the officers. He's instructed to go to his knees, which he does. But then when he's instructed to back up towards the officers so that they can, and Officer Hanks, in his affidavit, what he said is, the procedure is, he goes down to his knees, then I ask him to back up. Once he backs up, then I ask him to lay prone on the ground, and then we go handcuff him. That's what would have happened, except when he asked him to back up, instead of backing up, he stood back up. Now, one of the things I want to point out is, in the brief and counsel, an argument suggests that the plaintiff doesn't speak English. There's no evidence of that. There's evidence in the record that there's some question about whether he does or whether he doesn't. But they didn't actually put in any evidence of that. He's actually heard, the plaintiff has heard, at the end of the video, after he's handcuffed, he's heard speaking English. We know he's not compliant. We don't know if he's not compliant because he We don't know if he's not compliant because he's so intoxicated that he doesn't know what's going on. We don't know if he's not compliant because there's something else going on. There's somebody in the car. They could be fugitives, for all we know. What time of night was this again? I don't know. I don't remember the time. I know it was after dark, and it was on an unlit street. But I don't know the time. Another important point is, when Officer Martin arrived on the scene, it was Officer Hanks, who was driving the car that was pursuing Mr. Martin, who took command. And you can hear him on the video. He says, I've got, I don't remember exactly what he says, but he says, basically, I've got control. And Officer Hanks also put in a declaration. His declaration says, I have verbal control. He was the one in verbal command. He was the only one then supposed to be giving commands to Mr. Martin, to Mr. Ramirez, right? Now, when he gets up off his knees, then several officers are heard at the same time telling him to get back on his knees, which, again, he does. And what's important at this point, Your Honor, is Officer Martin, who's never even unholstered his weapon, right? The other officers have got their weapons pointed at Mr. Ramirez. Officer Martin has not even unholstered his weapon. He is instructed, along with Officer Swavey, to go hands-on. Who says, let's go hands-on? It was Officer Hanks. And in his declaration, Officer Hanks says that, basically, that Officer Swavey and Officer Martin were ordered to go hands-on, to take the defendant into custody. At that point in time, as Officer Martin is approaching, Officer Swavey, who was at his left, is also approaching. You can see it in the videos. And you can also see it, and it's also reflected in Officer Swavey's declaration, that she paused and had difficulty getting her firearm holstered. And she was doing it because she's got a, and if you read the brief of the appellants, they make the point that, when you have read the brief of the appellants, you'll see that they make some issue with the fact that Officer Swavey thought the situation was passive enough that it was OK for her to holster her weapon. The fact is, she had to holster her weapon because, like Officer Martin, she had been instructed to go hands-on, to take the witness, to take the defendant to the ground. And so, when she holsters her weapon, it doesn't make the situation less tense. It makes the situation more tense, because at the exact same time that she's holstered her weapon, so neither Officer Martin nor her have their weapons drawn, the other two officers on the left side of the car, Officer Hanks, and I can't remember the fourth officer's name, they're approaching the vehicle. And you can see all this on the video. They're approaching the vehicle to clear the vehicle because there is a concern that there might be somebody in the vehicle. All of the officers testified that there was a concern that, at that moment, because the defendant was still on his knees, looking forward towards the car, although he has his hands right here, he hasn't been searched, and he's got a baggy shirt on, which is all available on the video. As these officers approach this way, with their attention on the car, if he's armed, then he's in a prime position to shoot them. And so that's why Officer Martin and Officer Swayve, it was imperative that they take the defendant into custody. They were each going to grab, the testimony's undisputed, they were each going to grab one of his arms. But Officer Swayve was delayed because she had trouble holstering her weapon, so Officer Martin got there. And you can see on the video the force that he uses to take him down. Now, it's unfortunate that. Is it, is it, is it, I'll go review the declarations, of course, but are the officers saying that something went wrong with the takedown because of the timing at which they got there? They're not saying anything, well, they do say that what went wrong, they do both say that it was anticipated that Officer Swayve was going to grab the left arm. So that didn't happen, because I mean, I've seen the video, that doesn't. It didn't happen because she had to pause to holster her weapon. And so at that time, then, Officer Martin grabs the right wrist and the right bicep, and the defendant goes to the ground. We've all seen it. Yeah, someone says at some point soon after that, his head is bleeding. Do you know who says that on the video? I hear that. I didn't know if it was a, there's a bystander. I don't know. I know the defendant says it. OK, maybe it's him. And I think somebody else says it. And we're not disputing that he had a cut over his eye. He got, what's the nature of his injuries? He had a cut over his eye. He had a cut over his eye. And the stitches. He got stitches. He got no medication. There was no swelling. So the evidence, he was discharged with nothing but a few stitches. He never lost consciousness. And we're not arguing that it's a de minimis injury, but it's, you know, and so when we talk about the tense nature of the situation, we think in this case that there's no constitutional violation. Well, what if we disagreed with you and said, no, there is a constitutional violation? Which is my way to transition that I've got some time left and I need to talk about clearly established law. And so the appellants say that their best case is Darden. Darden. But as Your Honor will note at the beginning of the argument, Your Honor pointed out that there were lots of these cases where the video is inconclusive. And the video is moving around, and sometimes you see something and sometimes you don't see something. And in Darden, that's exactly what happened. In Darden, the video doesn't show the actual takedown of the defendant, of the deceased in that case. In that case, Mr. Darden died as a result. And there's conflicting testimony about what happened and that he was accused of being beaten and, I think, tased. And that they were accused of pinning him down while he couldn't breathe. And there was questions whether or not somebody said he could. So the evidence for the plaintiff was that he said he couldn't breathe and somebody else said he can't breathe. But the defendant's evidence was contradictory to that. We don't have any of that here. This is not a situation. All of the cases cited by the plaintiff are either cases where, for instance, there are a couple of cases where the defendant had already been placed in handcuffs and then they were using force. Or there were cases where there were multiple baton strikes and multiple tasings and knees to the back and other kinds of strikes. There were no strikes here. There's no suggestion that Officer Martin was doing anything other than his job and trying to protect the other officers on the scene. Importantly, I think if there was an issue here, the issue would be with respect to the escalation. And the argument's been made that, well, at the moment in time that the force was used, they say he was completely surrendered. I mean, we don't know if he was completely surrendered. We don't know what would have happened if he had been given another command to back up, to crawl backwards. We don't know what would happen because we didn't get the opportunity to see what would happen. Maybe he would have stood back up. Maybe he would have crawled backwards. Maybe there wouldn't have been an issue. But the point here is that Officer Martin was not in charge of any of that. That was Officer Hanks. And so if the dispute is that they terminated the negotiations early, that's not on Officer Martin. That was Officer Hanks that made the decision that he had had enough of the noncompliance and we were going to go hands-on because we needed to clear the car. And so if the complaint is that they resorted too early to force, then they should have sued Officer Hanks because that's not, because what's Officer Martin to do now when his other officers are now proceeding in front of this defendant who hasn't been searched, he hasn't been frisked, he's been noncompliant, he's left out of the negotiations, had them on a pursuit, he's got to secure the defendant. Your Honor asked about the reprimand. And I did want to address it because a couple of things. One, we objected to it. The district court didn't rely on it. It's not relevant because even if it was sustained, the fact, and this is assuming arguendo because there's no evidence in the record that it was sustained, even if it was sustained, a violation of a police department internal policy does not constitute a constitutional violation. The two are not the same. But what's important here is Officer Martin is not the police department, he's not the city of Garland, he's an individual defendant. He objected that the report was not authenticated, and it wasn't. He objected that it was not complete because it referenced certain attachments which were not attached. He objected that it hadn't been produced in discovery, and it hadn't been produced in discovery. But most importantly, he objected because it was a summary of an internal affairs investigation, not the findings of the Civil Service Commission, and it was actually simply a referral by the chief to the Civil Service Commission to have a hearing on the matter. And we don't know what then transpired as a result of that. It's also important to note that that took place, that that recommendation to the Civil Service Commission by the chief was issued months before the toxicology came back, which demonstrated that the plaintiff in this case, the driver of the car, at the time of the incident, his blood alcohol concentration was almost three times the legal limit. And so we don't know what effect the knowledge that the plaintiff was so intoxicated at the time might have had on the chief when he was making his referral to the Civil Service Commission. And so if there are any other questions, if there are not any other questions, then Officer Martin respectfully requests that the judgment of the district court be affirmed in its entirety. Thank you, counsel. Mr. Roberts, you have five minutes for rebuttal. Thank you, Your Honors. May it please the court. One thing that opposing counsel just stated was there is no suggestion Officer Martin did anything other than his job. That simply couldn't be further from the truth. That's the reason we have this lawsuit. And I think that really goes to show why there was an error in the district court when reviewing the evidence, which should have been reviewed in the light most favorable to the appellant in this case. It is the appellee's version of events that nothing went wrong other than Mr. Ramirez simply fell over once hands were put on him because of intoxication and the slope of the road. It sounds like he might have, I don't know if conceded is the right word, but there's a suggestion that the takedown didn't go as planned because the second officer didn't get there in time. Yes, Your Honor. And the reason that it didn't go as planned when viewing the facts most light and most favorable to the appellant is that it's because Officer Martin violently slammed Mr. Ramirez down into the ground. I know there's been talk about it. This is a Scott B. Harris case. When you look at the video, I believe that when you look at the video, it does show a violent slamming where his face hits the ground and his foot is thrown up over the back of the police car or over the back of the car he had been driving. Once the facts are viewed in the light most favorable to the appellant, I believe that shows that this was a constitutional violation. He was not a threat. And that's why I want to get into some of the clearly established law in this case. One question that was brought up earlier was, what exactly did Officer Martin know? What Officer Martin knew was that Mr. Ramirez was on his knees with his hands away from his body with no weapon in them. He was sitting like that for seven seconds prior to Officer Martin taking him to the ground violently. He knew that commands had stopped. And when the light most favorable to the appellant that we are arguing that the inference is that he is now in a position of control or at least subdued to the point where they could go hands on with him now in a safe manner. And that Officer Martin never unholstered his weapon. If Officer Martin believed that there was a weapon on Mr. Ramirez, he would have possibly said something. And that's actually something that this court has pointed out in the Newman case. In the Newman case, they stated that no officers made any comments about him having a weapon or him being armed, which went to disprove that they actually believed the suspect had a weapon on him in that case. So while Mr. Ramirez had not been searched at the time that Officer Martin went to approach and go hands on, the mere possibility of a weapon without any sort of evidence he was reaching for a weapon or had made threats of a weapon really doesn't get you there. This court also asked about the fleeing and how the fleeing made the situation more tense. But I would ask this court to look at the Cooper case. In that case, someone was pulled over for a DUI. And then that driver fled the vehicle and evaded. Now, he wasn't evading in a vehicle at this point, but he ran into a wooded area and hid. The officers approached with a canine. The officers found that there was no evidence that a reasonable officer could believe that he posed a serious threat, because at the time that the canine was biting him, you could see the suspect's hands. They were on top of the dog, and you could see that there was no weapon in his hands. And it's the same thing we have in our case here. Mr. Ramirez had not been searched, but his hands were visible away from his body with palms facing the officers. And that goes to show that he was not holding a weapon. And that's something Officer Martin would have seen when he approached from behind. The next thing I would like to point out is that this court asked when this case became a felony pursuit. Evading in a vehicle in Texas makes it a felony. Evading on foot would be a misdemeanor, unless there's other conditions involved. Evading in a felony is a felony when it's in a vehicle. So it's when he doesn't pull over, he keeps driving, then it becomes a felony pursuit. Yes, Your Honor. So there's no sort of, he's evading and waving a weapon, or he's evading and endangering lives. Evading in a vehicle makes it a felony pursuit. Because it was a felony pursuit, that makes it a felony stop. So there's no sort of additional facts that make it sound like he's more threatening to Officer Martin. Well, Mr. Banowski represented that once it becomes a felony pursuit, there are heightened, what's the phrase he used? Heightened set of procedures that are used to apprehend the suspect. Do you agree with that? I do agree with that, Your Honor. And that's why they had guns drawn, and they didn't just walk up and say, can I see your license and registration, please? They had guns drawn. But once they got him out of the car and behind the car on his knees, he was no longer evading. He was no longer fleeing. I think it's unquestioned when you look at the video that he was not actively resisting arrest or fleeing arrest. The only question here to whether or not he posed a threat is, was his noncompliance threatening? Because he did not say any threatening statements. He made no threatening gestures. He was holding no weapons. So the only way that this court can find, as the district court did, that he posed a threat is to find that he was noncompliant. But that would not be viewing this evidence in the light most favorable to the appellant, which would show that he was compliant, because he was compliant with the last issue of the order given. When you look at Bush, when you look at Darden, Newman, Cooper, Hanks, and DeVille, all of these cases show that there is some sort of noncompliance going on. No one's perfectly complying. Yet there are no facts that give rise to a threat or active resistance. And that is why this court has found that qualified immunity was inappropriate in those cases. Thank you. Thank you, counsel. Thanks for both your presentation of the case under submission. The court will take a 5, 10 minute break.